No.  91-523

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

DAVID ALARIC PALMER, a Protected Person,
by Martha Rose Diacon, his Conservator,

Plaintiff and Respondent,

-v-

FARMERS INSURANCE EXCHANGE,

Defendant and Appellant.

FILED

OCT 1 8 1993

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William Conklin & L.D. Nybo (argued), Conklin, Nybo
& Leveque, Great Falls, Montana

For Respondent:

Dennis Patrick Conner (argued), Great Falls,
Montana; and John C. Risjord (argued), Risjord &
James, Overland Park, Kansas

For Amicus:

Randy J, Cox, Boone, Karlberg & Haddon, Missoula,
Montana;  Dana L. Christensen, Murphy, Robinson,
Heckathorn & Phillips, Kalispell, Montana; an Robert
F. James (argued), James, Gray & McCafferty, Great
Falls, Montana

Submitted:  December 10, 1992

Decided:  October 18, 1993

Filed:

Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from an order based on a jury verdict and a judgment of $750,000 in compensatory damages and $750,000 in punitive damages against Farmers Insurance Exchange (Farmers) for breach of the covenant of good faith and fair dealing (bad faith). We reverse and remand for a new trial.

This action arose in conjunction with a claim by Palmer, the insured, against Farmers, the insurer, for uninsured motorist benefits. Palmer's claim ensued after a no-vehicle-contact motorcycle accident on June 10, 1984. Farmers requested that the court bifurcate the uninsured motorist claim from the bad faith claim and stay discovery proceedings concerning bad faith until the uninsured motorist claim was resolved. The court granted Farmers' request on August 21, 1986.

The uninsured motorist claim proceeded to trial in March of 1987. The jury found an uninsured motorist liable for Palmer's injuries. We affirmed the verdict and judgment on appeal. Palmer by Diacon v. Farmers Ins. Exch. (1988), 233 Mont. 515, 761 P.2d 401.

The bad faith action was revived in the fall of 1988 and the case went to trial on March 4, 1991. After the jury verdict, the trial judge approved the punitive damage award and entered judgment against Farmers. Farmers filed a motion for either a judgment notwithstanding the verdict or a new trial. The motion was deemed denied. This appeal followed.

The pertinent issues on appeal are:

2

1. Whether the District Court erred by denying Farmers' motion for directed verdict.

2. Whether the District Court erred in admitting evidence from the underlying trial.

3. Whether Farmers is entitled to a new trial because the District Court ordered Farmers to produce, and later allowed into evidence, correspondence between Farmers and its attorneys who defended the underlying uninsured motorist lawsuit.

   A. Whether the attorney-client privilege applies to first-party bad faith cases in which the insurer's attorney did not represent the interests of the insured in the underlying case.

   B. Whether Farmers' claim file contained material subject to attorney-client privilege.

   C. Whether Farmers voluntarily waived its attorney-client privilege.

   D. Whether evidence of privileged communications is admissible against the holder of the privilege after the court erroneously compelled its discovery.

   E. Whether the admission of privileged materials into evidence prevented Farmers from having a fair trial, thus entitling it to a new trial.

4. Whether the District Court erred in ordering the production of work-product materials and then allowing the materials into evidence.

   A. Whether the District Court erred in ordering Farmers to produce the work-product materials in its claim files.

   B. Whether the District Court erred in determining that one of Farmers' former defense attorneys waived the protection of the work-product doctrine by making testimonial use of certain work-product materials.

5. Whether the District Court erred by admitting evidence of the litigation tactics of Farmers' attorneys and of Farmers' decision to appeal.

   A. Whether evidence of an insurer's post-filing conduct, such as litigation strategy and tactics in defending the underlying suit, is admissible in a bad faith action based on the insurer's decision to deny coverage.

3

B.    Whether an insurer's decision to appeal the verdict in the underlying case is admissible as evidence in a subsequent bad faith action.

From the inception of the proceedings, Palmer has maintained that an unidentified tractor and semitrailer (the truck) crossed the centerline and ran his motorcycle off the road. Farmers denied the uninsured motorist claim in February of 1986, after a witness told a Farmers' claims adjuster that the truck was in its own lane. A few days later Palmer filed suit against Farmers for denying the claim and for bad faith.

Pursuant to a motion to compel, the court ordered production of Farmers' entire claim file during discovery on the bad faith claim. The court also ruled that Farmers was not required to produce materials dated after October, 26, 1988, the date Palmer notified Farmers that he intended to proceed with the bad faith claim. However, the materials dated prior to October 26, 1988 included confidential reports sent to Farmers by the attorneys who represented it in the uninsured motorist case.

On February 21, 1989, Farmers produced its claim file under court order. At that point, nothing had transpired in the bad faith action, except Palmer's motion to compel and a letter from Farmers' attorney Bill Gregoire to Palmer's attorney. The letter stated that Farmers would have to obtain new counsel for the bad faith trial because Farmers would likely call him and Farmers' other attorneys, Marvin Smith and James Walsh, as witnesses in the bad faith trial.

4

Equipped with attorney Gregoire's confidential reports to Farmers, Palmer deposed several of Farmers' employees who had worked on the uninsured motorist case. Among the persons that Palmer questioned using the privileged materials was Bud Rausch, Farmers' branch claims supervisor. Neither Rausch nor any of the other deponents had been designated as expert witnesses at the time of their depositions.

At a deposition on September 13, 1989, Palmer's attorney cross-examined Rausch extensively on five of the letters Farmers received from its attorney Gregoire and on events which transpired during preparation for trial and during trial. Palmer made similar use of Gregoire's letters to Farmers when he deposed a Farmers' claims representative on February 16, 1990, and Farmers' investigator on February 19, 1990.

Farmers identified its prospective expert witnesses on July 18, 1990, in an answer to an interrogatory. Farmers identified Frank Weedman and Bud Rausch as potential expert witnesses. In addition, Farmers identified attorneys Smith, Walsh, and Gregoire as potential witnesses in the bad faith trial. The answer also stated: "If called as witnesses, those individuals will not be examined regarding their confidential privileged communications to the defendant regarding that underlying suit or the instant bad faith action."

Farmers hired Weedman as an expert witness regarding reasonable insurance industry practice on March 8, 1990, a year after Farmers produced its claim file for Palmer. Farmers sent a

5

copy of the same claim file to Weedman for his review. Shortly thereafter, Farmers filed a motion for return of privileged communications.

Nine months later, one week before trial, the District Court ruled on the motion for return of privileged communications. The court ruled that neither the attorney-client privilege nor the work-product doctrine apply in first-party bad faith actions, and therefore, Palmer was entitled to Farmers' entire claim file. The court then ruled that Farmers had waived the privilege because the experts it intended to call at trial based their opinions on a review of the entire claim file, including attorney correspondence.

At trial, most of Palmer's case-in-chief involved evidence concerning the underlying trial and Farmers' post-filing conduct. The evidence included the strategy and litigation tactics of Farmers' attorneys who defended the underlying case and testimony from the underlying trial.

In questioning Bud Rausch, the first witness at trial, Palmer introduced into evidence and read nine of the reports consisting of confidential communications between Farmers and its former attorneys. After the reports had been disclosed to the jury, Farmers called its former attorneys as witnesses to explain their actions in defending the underlying uninsured motorist case. Near the end of the trial, Farmers offered the complete claim file into evidence to rebut Palmer's use of selected portions of the privileged materials.

6

Farmers made a motion for a directed verdict at the end of Palmer's case-in-chief. The court denied the motion. Farmers renewed the motion at the close of all of the evidence with a stipulation from Palmer that the earlier motion and arguments were deemed repeated. The court accepted the form of the motion and again denied it.

This opinion will refer to additional facts where they are pertinent to the discussion.

Our review of the District Court's conclusions of law is plenary; we determine whether the court's conclusions are correct. We review discretionary acts of the District Court to determine whether the court abused its discretion. Steer Inc. v. Dept. of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

I.

Did the District Court err by denying Farmers' motion for a directed verdict?

This is a borderline issue, considering the closeness of the questions of fact in the underlying case. See Palmer by Diacon, 761 P.2d at 404. But, given the standard for granting a directed verdict, we conclude that the District Court did not commit reversible error by denying Farmers' motion for a directed verdict.

This case arose before the legislature enacted § 33-18-242, MCA, which appears to have codified our common law standard of liability for bad faith in denying insurance coverage. Under Montana common law, an insurer cannot be held liable for bad faith in denying a claim if the insurer had a reasonable basis for contesting the claim or the amount of the claim. Tynes v. Bankers

7

Life Co. (1986), 224 Mont. 350, 364, 730 P.2d 1115, 1124. As we have stated, "[i]t is generally held that an insurer is entitled to challenge a claim on the basis of debatable law or facts and will not be liable for bad faith or punitive damages for denying coverage if its position is not wholly unreasonable." Safeco Ins. Co. v. Ellinghouse (1986), 223 Mont. 239, 248, 725 P.2d 217, 223; see also St. Paul Fire & Marine Ins. Co. v. Cumiskey (1983), 204 Mont. 350, 665 P.2d 223; § 33-18-242(5), MCA.

Farmers cited Cumiskey to support its position that the court should have granted its motion for a directed verdict. In Cumiskey, an insurer filed a declaratory judgment action, asking the court to interpret the policy and determine the relationships of the parties and their legal rights. The insured counterclaimed, alleging that the insurer acted in bad faith by bringing the declaratory judgment action instead of paying the claim. Cumiskey, 665 P.2d at 226-27.

The trial court granted a directed verdict in favor of the insurer. We upheld the court because in a proper case, an insurer may file a declaratory judgment action to obtain a determination of the validity, continuance or coverage of the insurance policy, the extent of liability, or the insurer's duty under the policy. Cumiskey, 665 P.2d at 227. We held that filing a declaratory judgment action under appropriate circumstances does not necessarily constitute bad faith. See Cumiskey, 665 P.2d at 227.

In this case, Farmers contested liability, contending that Palmer's accident was not caused by another motorist, and

therefore, Palmer's uninsured motorist policy did not cover the accident. Cumiskey does not require the court to grant a directed verdict under the facts of this case.

Farmers also contends that the District Court should have granted its motion for a directed verdict because Farmers had a reasonable basis to deny coverage. To support its contention, Farmers argues that statements taken from witnesses before Farmers denied the claim gave it a reasonable basis for denying the claim.

Witness Atchison told a claims investigator that, contrary to Palmer's assertion, a truck did not run Palmer's motorcycle off the road. In a later deposition, Atchison adhered to his story, stating that from the time he first saw the truck until the motorcycle went off the road, the truck never left its own lane. In all of his statements, Atchison never deviated from his testimony that the truck was in its own lane and did not run Palmer off the road.

In addition, Farmers obtained statements from some dirt bikers. They reported seeing a motorcycle speeding down the highway at full throttle about one-half mile from the accident scene. It matched the description of Palmer's motorcycle. Shortly thereafter, they came across Palmer's motorcycle along with Palmer and his passenger in the ditch. According to the dirt bikers, no other speeding motorcycles went past them before they came upon the accident.

Farmers argues that the statements of Atchison and the dirt bikers gave it a reasonable basis for denying the claim as a matter

of law. Under the law, if Farmers had a reasonable basis upon which to deny the claim, it cannot be found to have acted in bad faith. Tynes, 730 P.2d at 1124. Because Palmer's uninsured motorist policy would not cover the accident unless another vehicle ran Palmer off the road, the witnesses' statements appear at first glance to provide a reasonable basis for denying the claim.

Palmer, however, counters that it was unreasonable for Farmers to rely on Atchison's statements because Atchison was an unreliable witness. Palmer points out that Atchison kept changing details of his story, such as the exact speed of the motorcycle before it left the road and whether he saw the motorcycle as it left the road or merely a cloud of dust. Palmer argues that it was unreasonable for Farmers to deny coverage based on Atchison's information because Atchison changed details of his story. The credibility of Atchison is, therefore, a question of fact in this case.

Palmer supplied another witness who was riding a motorcycle similar to Palmer's. The witness testified that he and his wife were speeding on the same road at about the time of the accident. Palmer argues that this gives another reasonable explanation of the speeding motorcycle seen by the dirt bikers. However, there is no evidence that Farmers knew of this witness' statement when it denied the claim.

In a jury trial, a judge may direct a verdict in favor of the party entitled thereto when the case presents only questions of law. Section 25-7-302, MCA. When a defendant moves for a directed

verdict, the court views only the evidence presented by the plaintiff and views it in the light most favorable to the plaintiff. Cremer v. Cremer Rodeo Land & Livestock Co. (1979), 181 Mont. 87, 91, 592 P.2d 485, 488. A court may not withdraw a case from the jury, unless the conclusion requested by the defendant must follow from the evidence as a matter of law and the plaintiff cannot recover under any view that could reasonably be drawn from the evidence. Cremer, 592 P.2d at 488.

The test for determining whether the evidence is legally sufficient to withdraw a case from the jury is whether reasonable people could draw different conclusions from the evidence. If only one conclusion is reasonably proper, a directed verdict is appropriate. Cremer, 592 P.2d at 488.

Here, the court evidently concluded that more than one conclusion was reasonably proper based on the evidence. Consequently, it denied Farmers' motion for directed verdict. In reviewing the court's denial of Farmers' motions, we apply the common-law standard for holding an insurer liable for bad faith in denying a claim. Under that standard, an insurer cannot be held liable if the insurer had a reasonable basis for contesting the claim. Tynes, 730 P.2d at 1124.

In this case, there is conflicting evidence concerning the credibility of the witnesses. It is for the jury to determine the probative value of the evidence and draw inferences from the evidence, and then determine whether Farmers had a reasonable basis for denying the claim.

We hold that Cumiskey does not require the District Court to grant a directed verdict for Farmers. We further hold that the court did not commit reversible error by concluding that reasonable people could draw different conclusions about whether Farmers' had a reasonable basis for contesting Palmer's claim. Accordingly, the court did not err in denying Farmers' motion for a directed verdict.

## II.

Did the District Court err in admitting evidence from the underlying trial and other irrelevant evidence?

Because we are reversing on other grounds and remanding for a new trial, we will not rule on the particulars relative to this issue. However, some comment is necessary because the District Court admitted into evidence a large quantity of material relating to the underlying uninsured motorist trial.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, M.R.Evid. Trial judges have the discretion to determine the relevancy and admissibility of evidence. Dahlin v. Holmquist (1988), 235 Mont. 17, 20, 766 P.2d 239, 241. However, the admission of irrelevant evidence is an abuse of discretion and warrants a new trial if it affects the substantial rights of a party. Dahlin, 766 P.2d at 241.

Material from the underlying trial tending to show what Farmers knew or should have known at the time it made the decision to deny the claim is relevant. In addition, material tending to

**12**

show whether or not such knowledge supports a reasonable basis for denying the claim is relevant. See Rule 401, M.R.Evid. However, evidence from the underlying trial that is not related to Farmers' basis for denying the claim is not relevant.

The essential issue in this case is whether Farmers had a reasonable basis for denying the claim. Any evidence that does not relate to facts of consequence to this issue is not relevant.

### III.

Did the District Court erroneously order Farmers to produce, and later allow into evidence, correspondence between Farmers and its attorneys who defended the underlying uninsured motorist lawsuit, thus entitling Farmers to a new trial?

In a request for production of documents on February 26, 1986, Palmer requested Farmers' "entire file on the accident described in the Complaint filed herein, including but not limited to any and all documents relating to plaintiff's claim for uninsured motorist benefits." Palmer also requested from Farmers, "[a]ny and all correspondence between you, your agents and attorneys and plaintiff, plaintiff's agents and attorneys, concerning plaintiff's claim for uninsured motorist benefits."

Sometime later, Palmer moved to compel discovery of Farmers' claim files developed in investigating and defending the uninsured motorist suit. Farmers produced everything in its files, except for correspondence between Farmers and its attorneys and materials dated after October 8, 1985, the date Palmer's attorney threatened to sue for bad faith if Farmers did not pay Palmer's claim.

Farmers objected to producing exhibits consisting of confidential attorney-client communications on the grounds that

**13**

they were protected by attorney-client privilege. Farmers objected to producing other exhibits on the grounds that they were immune from discovery under the work-product rule. The court ordered Farmers to produce the attorney-client communications.

In an order dated February 16, 1989, the court ruled that "defendant's assertion of the attorney-client privilege with respect to those claim file documents which constitute communications between it and its counsel is overcome by plaintiff's need for such materials in preparation of its bad faith case against defendant."

On February 21, 1989, pursuant to court order, Farmers produced all claim file materials dated before October 26, 1988. Among the materials were several letters from Farmers' defense attorney Gregoire, including eight letters marked "confidential reports." Over continuing objections by Farmers, the District Court allowed into evidence these letters and other correspondence between Farmers and its attorneys who defended the underlying uninsured motorist case.

Farmers argues that it did not have a fair trial because the District Court admitted this privileged material into evidence. Farmers points out that the bad faith trial should have centered on whether the information it had when it denied Palmer's claim constituted a reasonable basis for contesting the claim. Farmers contends that by admitting privileged materials, the court allowed Palmer to focus much of the bad faith case on the litigation tactics defense counsel used in preparing for the underlying trial,

**14**

in conducting the trial itself, and in recommending and pursuing the subsequent appeal. Therefore, Farmers argues, it is entitled to a new trial. We agree.

The fundamental purpose of the attorney-client privilege is to enable the attorney to provide the best possible legal advice and encourage clients to act within the law. The privilege furthers this purpose by freeing clients from the consequences or the apprehension of disclosing confidential information, thus encouraging them to be open and forthright with their attorneys. State ex rel. United States Fidelity and Guaranty Co. v. Second Judicial Dist. Ct. (1989), 240 Mont. 5, 10, 783 P.2d 911, 914 (USF&G), (citing Upjohn Co. v. United States (1981), 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591).

Another important policy behind the attorney-client privilege is to foster the attorney-client relationship by ensuring that attorneys are free to give accurate and candid advice without fear that the advice will later be used against the client. We approve of the Missouri Supreme Court's recognition of this policy, articulated as follows:

> As long as our society recognizes that advice as to matters relating to the law should be given by persons trained in the law--that is, by lawyers--anything that materially interferes with that relationship must be restricted or eliminated, and anything that fosters the success of that relationship must be retained and strengthened. The relationship and the continued existence of the giving of legal advice by persons accurately and effectively trained in the law is of greater societal value, it is submitted, than the admissibility of a piece of evidence in a particular lawsuit. Contrary to the implied assertions of the evidence authorities, the heavens will not fall if all relevant and competent evidence cannot be admitted.

15

State ex rel. Great Am. Ins. Co. v. Smith (Mo. 1978), 574 S.W.2d 379, 383 (quoting Sedler & Simeone, Comment, Privileges in the Law of Evidence: The Realities of Attorney-Client Confidences, 24 Ohio St.L.J. 1, 3 (1963)). With these policies in mind, we will apply the statutes and rules to the particular contentions of the parties.

A.  Does the attorney-client privilege apply to first-party bad faith cases in which the insurer's attorney did not represent the insured's interests in the underlying case?

Palmer contends that all correspondence between Farmers and its former attorneys is discoverable because the attorney-client privilege does not apply in first-party bad faith actions such as this one. We previously held that the attorney-client privilege applies in the context of third-party bad faith actions, but we have not determined whether the privilege applies in first-party bad faith litigation. USF&G, 783 P.2d at 916.

For definitional purposes, a third-party bad faith action is one in which the plaintiff is a third-party claimant rather than the insured. In a first-party bad faith action the plaintiff is the insured. There are different types of first-party bad faith actions.

Palmer argues that this Court has made a distinction between third-party and first-party bad faith actions. Palmer argues, based on federal district court cases, that the attorney-client privilege does not apply in first-party bad faith cases. See Bergeson v. National Surety Corp. (D.Mont. 1986), 112 F.R.D. 692; Baker v. CNA Ins. Co. (D.Mont. 1988), 123 F.R.D. 322. We disagree.

**16**

One type of first-party bad faith action involves dual representation by the attorney. Judge William Jameson first expressed the concept of dual representation as follows: "Under an insurance contract, however, the insurer initially employs the attorney to represent the interests of both the insured and the insurer." Jessen v. O'Daniel (D.Mont. 1962), 210 F.Supp 317, 331-32; see also Ellinghouse, 725 P.2d at 226; USF&G, 783 at 913-14.

First-party bad faith cases involving dual representation often arise after a third-party claimant obtains a judgment in excess of policy limits and the insured later sues the insurance company for failure to settle within policy limits. In these cases, courts have held that the insured is entitled to the entire claim file prepared for the underlying lawsuit, because the insurer created the file primarily on behalf of the insured. E.g., Baker, 123 F.R.D. at 326. The rationale courts use to abrogate the attorney-client privilege in such cases is that one joint client (the insurer) cannot assert the privilege against another joint client (the insured). See, e.g. Baker, 123 F.R.D. at 325-26; see also 22 A.L.R.2d 659 § 3; 4 A.L.R.4th 765 (annotations concerning applicability of attorney-client privilege in dual representation cases).

The present case is a distinct type of first-party action. In this type of action, the claimant and the insurer are in adverse positions from the outset of the underlying case. Farmers stepped into the shoes of the unidentified third party motorist when it denied Palmer coverage under his uninsured motorist policy. The

**17**

attorneys who represented Farmers in the uninsured motorist case have not represented Palmer, therefore the dual representation reasoning does not apply in this case.

The nature of the relationship, not the nature of the cause of action, controls whether communications between attorney and client can be discovered. USF&G, 783 P.2d at 915. The attorney-client privilege protects communications in first-party bad faith cases when the insurer's attorney did not represent the interests of the insured in the underlying case. That is the nature of the relationship here; therefore, the attorney-client privilege applies in this case.

B.    Did Farmers' file contain material subject to attorney-client privilege?

The subject matter and author of each exhibit is critical in determining whether the attorney-client privilege prevents its discovery. Absent a voluntary waiver or an exception, the privilege applies to all communications from the client to the attorney and to all advice given to the client by the attorney in the course of the professional relationship. Kuiper v. Dist. Ct. of the Eighth Judicial Dist. (1981), 193 Mont. 452, 461, 632 P.2d 694, 699; see also § 26-1-803, MCA.

The portion of Farmers' file produced under court order contained "confidential reports" concerning the pending litigation from Farmers' attorney Gregoire to Farmers. The reports constituted advice from Gregoire to Farmers on many matters relating to Palmer's claim. In the reports, Gregoire evaluated

18

witnesses, evaluated the trial, advised Farmers concerning his investigation and trial preparation, advised Farmers on his opinions of defense and trial strategy, advised Farmers on the prospect for a successful defense, and advised Farmers on post-trial negotiations and on grounds for appeal.

The reports clearly contain advice given to Farmers by its attorney in the course of the attorney's professional relationship. The attorney-client privilege protects Farmers from disclosing those reports and any other correspondence sent in the course of the professional relationship with its attorneys. See Kuiper, 632 P.2d at 699.

The privilege of non-disclosure is not lost merely because the communications contain relevant nonlegal considerations. Union Oil Co. of Calif. v. Dist. Ct. (1972), 160 Mont. 229, 236, 503 P.2d 1008, 1012. The protection applies unless the communications fall within some exception to the privilege or Farmers voluntarily waived the privilege.

C.   Did Farmers voluntarily waive its attorney-client privilege?

Palmer contends that Farmers waived its attorney-client privilege before the court ordered production of the privileged correspondence. According to Palmer, Farmers waived the privilege when Farmers' attorney Gregoire sent a letter dated November 15, 1988, to Palmer's attorney, stating that Farmers would have to obtain new counsel for the bad faith trial because he and Farmers' other attorneys, Smith and Walsh, might be called as witnesses in the trial. Palmer argues that after Gregoire sent the letter,

**19**

Palmer was entitled to discover the bases of the testimony and opinions those attorneys would present to the jury.

This argument has no merit for two reasons. First, the attorney-client privilege belongs to the client and an attorney cannot waive it without consent of the client. See § 26-1-803, MCA; Rule 503, M.R.Evid. Second, Farmers did not list the attorneys as witnesses until July 18, 1990, over a year _after_ the court ordered Farmers to produce the privileged materials. Even then, Farmers stated that the attorneys would testify to factual matters, but would not testify regarding confidential privileged information.

Palmer further contends that Farmers voluntarily waived its attorney-client privilege several times _after_ Farmers produced the privileged material under court order. Notably, all of the alleged waivers occurred after the court compelled discovery and Palmer had made extensive use of the privileged materials in preparing his case. Palmer's arguments are inconsequential because Farmers did not voluntarily release the attorney communications--the court ordered it to do so. We will, however, address each of Palmer's arguments in turn.

Palmer asserts that Farmers did not object to his cross-examination regarding the contents of the privileged correspondence at the deposition of Bud Rausch, Farmers' branch claims supervisor. In so arguing, Palmer overlooked the following continuing objection made by Farmers' attorney at the beginning of the deposition.

"[I]n order to preserve our objections, I wish to state
a general and continuing objection to any and all

reference to and questioning regarding documents from the claim files of Farmers Insurance Exchange, pertaining to Mr. Palmer's claims in their several, various versions, which documents we produced over objection and pursuant to the court's order compelling production, dated February 16, 1989. Defendant's objections are that such documents are immune from discovery under the work-product protection afforded by Rule 26(b)3 of the Montana Rules of Civil Procedure. <u>And also, because a great many of such documents constitute communications between defendant and its attorneys and are privileged under the attorney-client privilege, I have a second objection.</u> (Emphasis added.)

Farmers thus preserved its objection to Palmer's use of the privileged materials, and nothing in Rausch's deposition acted as a waiver of Farmers' attorney-client privilege.

Palmer next contends that Farmers waived its attorney-client privilege by relying on advice of counsel in its decision to deny Palmer's claim. However, mere reliance on an attorney's advice is not the crucial factor. The attorney-client privilege applies "unless the insurer directly relies on advice of counsel <u>as a defense to the bad faith charge</u>." (Emphasis added.) Spectra-Physics v. Superior Court (Cal.App. 1988), 244 Cal.Rptr. 258, 261; see also Transamerica Title Ins. Co. v. Superior Court (Cal.App. 1987), 233 Cal.Rptr. 825, 829.

Upon cross-examination in his deposition and at trial, Bud Rausch stated that advice of counsel influenced Farmers' decision to deny Palmer's claim. Although Farmers listened to the advice of counsel in deciding to deny Palmer's uninsured motorist claim, Farmers did not directly rely on advice of counsel as a defense to Palmer's bad faith claim. Therefore, Palmer's contention that

21

Farmers waived its privilege by relying on advice of counsel is lacking in merit. See Spectra-Physics, 244 Cal.Rptr. at 261.

Palmer next contends that Farmers did not object at trial to the admission of privileged communications. On the contrary, during a hearing on the morning of trial, Farmers made a continuing objection to use of the privileged materials as evidence. The court granted the request for a continuing objection so that at trial Farmers' attorney would not have to get up and object continually, whenever privileged material was discussed or offered into evidence. Thereafter, Farmers was not required to state specific attorney-client privilege objections to each exhibit.

Palmer next contends that at trial Farmers made an "unequivocal and thorough waiver of purported attorney-client privilege." During arguments over the relevance of some communications between Farmers and its attorneys, the discussion focused on which communications Palmer wanted to examine. Farmers counsel stated, "It's already been waived. It's already been produced." Taken in context, this statement is not a waiver, rather it is a comment that there were no attorney-client communications left that had not been produced under court order.

Palmer next contends that Farmers made multiple waivers by naming attorneys as witnesses, by furnishing their communications to experts who then testified with regard to them, by permitting their insured to testify to communications without objection, and by calling their attorneys to the witness stand to testify to the subjects of the privileged information. Under the circumstances of

**22**

this case, these actions do not constitute a waiver of the attorney-client privilege.

One thing is clear. At the time the District Court abrogated Farmers' attorney-client privilege and ordered production of Farmers' claim file and all confidential attorney-client communications between Farmers and its attorneys Smith, Walsh, Clarke, and Gregoire, Farmers had done nothing that could be interpreted as a voluntary relinquishment of its right to claim the privilege.

As a general rule, "[a] person upon whom these rules confer a privilege against disclosure waives the privilege if the person . . . voluntarily discloses or consents to disclosure of any significant part of the privileged matter." Rule 503, M.R.Evid. Mere reference to privileged reports is not enough to waive the attorney-client privilege. To have waived the privilege by disclosing privileged communications, Farmers would have had to voluntarily divulge the specific confidential material contained in the reports. See Union Oil Co. of Calif., 503 P.2d at 1012-13.

Once the court erroneously abrogated Farmers' attorney-client privilege by compelling discovery of the confidential reports, it was too late for a voluntary waiver to occur and Farmers' claim of privilege was not defeated. See Rule 504, M.R.Evid. Farmers, therefore, did not voluntarily waive the attorney-client privilege applicable to the communications between Farmers and its attorneys.

D. Is evidence of privileged communications admissible against the holder of the privilege if the court erroneously compelled its discovery?

**23**

The District Court in this case compelled discovery of all the materials dated after October 26, 1988, in the claim file, including materials subject to attorney-client privilege. In so ruling, the court found that Palmer demonstrated a substantial need for the materials and would incur undue hardship in obtaining the substantial equivalent of those privileged materials.

The District Court seems to have confused the attorney-client privilege with the work-product doctrine. A showing of need cannot defeat the attorney-client privilege, whereas a showing of need may overcome the immunity from discovery given to an attorney's work product. USF&G, 783 P.2d at 915.

As discussed above, the purpose of the attorney-client privilege is to foster the attorney-client relationship by enabling attorneys to provide the best advice possible to their clients and encourage the clients to act within the law. The privilege furthers this purpose by encouraging clients to give information to their attorneys without fear that it will later be used against them.

The privilege also furthers this purpose by allowing attorneys to give candid advice to clients without fear that later it can be used against the client. Our statute reflects this policy by including as privileged communications any advice from the attorney to the client given within the professional relationship. See § 26-1-803, MCA.

The Montana Rules of Evidence promote the policies underlying the attorney-client privilege by providing that "[a] claim of

**24**

privilege is not defeated by a disclosure which was compelled erroneously . . . ." Rule 504, M.R.Evid. This rule provides a remedy for the holder of a privilege when a court erroneously compels discovery of privileged material. "The remedy provided is that the privilege may be subsequently claimed and the disclosed subject matter made inadmissible." Rule 504, M.R.Evid., Commission Comments.

Rule 504 was intended for this situation, in which the holder of a privilege was compelled to disclose privileged matters pursuant to court order. Rule 504, M.R.Evid., Commission Comments. Evidence of the privileged communications between Farmers and its attorneys was not admissible against Farmers merely because the court erroneously compelled its discovery.

E. Did the admission of privileged materials into evidence prevent Farmers from having a fair trial, thus entitling it to a new trial?

The District Court misconstrued the law when it ordered Farmers to produce privileged material and admitted the privileged material into evidence. An example of the prejudicial effect of the disclosure of the correspondence between Farmers and their attorneys, was the attorneys' analysis and recommendations to Farmers relative to the underlying case being dangerous to Farmers and the need for the retention of an accident reconstruction expert. The alleged failure to timely retain such an expert contrary to the recommendation of their attorneys was a substantial element in Palmer's proof of Farmers' bad faith in investigating and settling Palmer's claim. Palmer claimed the retention of such

**25**

an expert and his opinion would have refuted any statements relied on by Farmers that Palmer was speeding. The attorneys' analysis and recommendations and Farmers' reaction to them was brought out thoroughly in the direct examination by Palmer's attorney of Farmers' branch claim supervisor as an adverse witness. Such correspondence was also noted extensively in Palmer's attorneys' final argument as evidence of bad faith and failure to timely and properly investigate the claim. This error also helped Palmer to focus his case on the trial preparation strategy and litigation tactics of Farmers' attorneys, rather than on whether Farmers had a reasonable basis for denying liability. In issue V below, we further discuss how evidence of Farmers' litigation tactics and strategy prejudiced Farmers.

The admission of privileged correspondence into evidence materially affected Farmers' substantial rights and prevented Farmers from having a fair trial. See § 25-11-102(1), MCA. Therefore, we vacate the District Court's order and judgment and remand for a new trial in which Farmers can reassert its attorney-client privilege. See Rule 504, M.R.Evid., Commission Comments.

IV.

Did the District Court err in ordering the production of work-product materials and then allowing the materials into evidence?

On February 16, 1989, the District Court ordered production of all Farmers' claim file materials dated after October 26, 1988, the date of a letter from Palmer's attorney to Farmers' attorney expressing that Palmer would proceed with the bad faith action. During the second week of trial, the court ordered Farmers' former

26

defense counsel to produce the firm's witness files to Palmer's counsel. Farmers contends that the District Court erred in ordering production of these materials on the grounds that some of the materials were immune from discovery under the work-product doctrine. We agree.

We are remanding because of errors involving the issue of attorney-client privilege, but we are also remanding based on this issue because the admission of certain work-product materials affected Farmers' substantial rights and prevented it from having a fair trial. See § 25-11-102(1), MCA.

A. Did the District Court err by ordering Farmers to produce the work-product materials in its claim file?

In response to Palmer's motion to compel discovery of Farmers' claim file, Farmers objected to producing any materials dated after October 8, 1985. On that date, Palmer's attorney threatened to sue for bad faith if Farmers denied Palmer's claim. Farmers argues that, after that date, the unprivileged materials in the file were prepared in anticipation of litigation, thus were subject to the work-product doctrine.

The work-product doctrine protects materials prepared in anticipation of litigation, even though litigation is not in progress. Rule 26(b)(3), M.R.Civ.P. Normally, claim files are commenced in anticipation of litigation and an investigation must be geared toward the eventuality of litigation. For that reason, we have held that work-product protection applies from the time a claim file is opened. Kuiper, 632 P.2d at 701.

**27**

In a bad faith case, however, the investigation is not geared toward ultimate bad faith litigation from the time the insurer opens a claim file. At that time, the insurer would have no reason to expect bad faith litigation and investigations are not made with the expectation of such litigation.

In the present case, Farmers does not seek the protection of the work-product doctrine for materials prepared between the time it opened the claim file and October 8, 1985. Therefore, we need not rule on whether the doctrine applies to materials dated during that time period.

Materials prepared after Palmer's attorney threatened to sue for bad faith if Farmers denied Palmer's claim, however, were prepared with an eye toward eventual bad faith litigation. Therefore, any materials dated after October 8, 1985, are subject to the work-product doctrine. Materials in the files dated after that date, therefore, are discoverable only upon the required showing discussed below.

In the February 16, 1989 order, the court found: "[a]fter considering the arguments of counsel and the court deeming itself fully advised, the court finds that plaintiff had made a satisfactory showing that he has substantial need of defendant's claim file materials for the preparation of plaintiff's bad faith case against defendant and that plaintiff is unable without undue hardship to obtain the substantial equivalent of those materials, thus overcoming defendant's work-product objection."

As discussed above, if materials in the files are privileged because they are confidential attorney-client communications, they are immune from discovery. However, materials consisting of work product prepared in anticipation of litigation or in another related case have a qualified immunity from discovery under the work-product doctrine. See Rule 26(b)(3), M.R.Civ.P. The immunity offered by the doctrine is only a qualified immunity because work product is discoverable in certain circumstances.

The immunity offered by the work-product doctrine depends on the type of work product being sought. There are two basic types of work product. First, there is ordinary work product, which relates to factual matters. Next, there is opinion work product, which relates to mental impressions, opinions, conclusions, or legal theories. See Rule 26(b)(3), M.R.Civ.P.

Ordinary work product is discoverable to the extent that it is not privileged and is "relevant to the subject matter involved in the pending action." Rule 26(b)(1), M.R.Civ.P. However, a party can discover ordinary work product "prepared in anticipation of litigation or for trial or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or, agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Rule 26(b)(3), M.R.Civ.P.

"At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles (1975), 422 U.S. 225, 238, 45 L.Ed. 141, 154, 95 S.Ct. 2160, 2170. Because of this purpose, opinion work product is subject to additional protection by the court.

The Montana Rules of Civil Procedure provide this protection by stating that in ordering discovery of work product upon the required showing, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Rule 26(b)(3), M.R.Civ.P. This Rule does not absolutely preclude discovery of opinion work product, rather it mandates that the court provide greater protection for opinion work product than for ordinary work product. See Nobles, 422 U.S. at 238-40.

This Court has endorsed the following rationale concerning the greater protection granted to opinion work product:

> It is clear that opinion work product is entitled to substantially greater protection than ordinary work product. Therefore, unlike ordinary work product, opinion work product cannot be discovered upon a showing of substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship. [See Rule 26(b)(3), M.R.Civ.P.] In our view, opinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances. See Hickman v. Taylor, supra. Our unwillingness to recognize an absolute immunity for opinion work product stems from the concern that there may be rare situations, yet unencountered by this court, where weighty considerations of public policy and a proper administration of justice would militate against the nondiscovery of an attorney's

30

> mental impression. [Actually, the special protection
> Rule 26(b)(3) gives to opinion work product is broader
> and protects the mental impressions of an attorney or
> other representative of a party concerning the
> litigation.] Absent such compelling showing, the . . .
> opinion work product should remain immune from discovery.

Kuiper, 632 P.2d at 701-02 (citation omitted).

Several courts, including the Ninth Circuit Court of Appeals, have designated a rare and extraordinary circumstance when opinion work product is discoverable. We agree with the reasoning of those courts which have held that opinion work product is discoverable when the mental impression is _directly at issue_ in the case and the need for the material is compelling. See, e.g., Holmgren v. State Farm Mut. Auto. Ins. Co. (9th Cir. 1992), 976 F.2d 573, 577; Handgards, Inc. v. Johnson & Johnson (N.D.Cal. 1976), 413 F.Supp. 926, 932-33.

To clarify the terms we use in this test, by "directly at issue in the case" we mean that the mental impressions actually are _the issue_ in the case. To meet the "compelling need" requirement, the party seeking discovery must demonstrate that weighty considerations of public policy and the administration of justice outweigh the need to protect the mental impressions of the opposing party's attorneys or its representatives. See Kuiper, 632 P.2d at 701-02.

In a bad faith case, such as the present case, where the issue is whether the insurer had a reasonable basis for denying the claim, the mental impressions and opinions of the insurer are directly at issue. The basis for denying such a claim lies only in the mental impressions of those representatives of the insurer who

**31**

decided to deny the claim. Consequently, a party may discover the opinion work product of the representatives whose mental impressions are directly at issue, but only upon a showing of compelling need beyond the substantial need/undue hardship test required by Rule 26(b)(3), M.R.Civ.P., for ordinary work product. See Holmgren, 976 F.2d at 577.

Here, the District Court ordered production of Farmers' entire claim file. Farmers' claims agents and a branch claims supervisor made the decision to deny coverage, so their mental impressions and opinions are directly at issue in this case; therefore, materials containing the insurer's mental impressions are discoverable on a showing of compelling need.

It is difficult to envision a circumstance in which the compelling need requirement would not be met when the mental impressions of a party are directly at issue in the case. However, because of the possibility of a rare and extraordinary circumstance in which the mental impressions should not be discovered, we decline to rule that the compelling need requirement is automatically met in such cases.

The work-product doctrine, however, protects materials containing the mental impressions of Farmers' attorneys. The court ruled that when attorney Walsh took the stand, Farmers placed advice of counsel squarely at issue in the proceedings. Farmers, however, did not rely on advice of counsel as a defense to the bad faith charge. The insurer, not the attorneys, made the ultimate decision to deny coverage in this case. Therefore, attorney mental

**32**

impressions and opinions are not directly at issue, so the threshold requirement of the test for discoverability of opinion work product is not met. As a result, materials that contain the mental impressions and opinions of Farmers' former attorneys are immune from discovery under the work-product doctrine, unless a waiver occurred.

The District Court erred by ordering Farmers to produce all claim file materials dated after October 26, 1988, on a showing of substantial need and undue hardship. On remand, it is incumbent on Farmers to show which materials included in the District Court's order contain opinion work product. The court then must apply the law to each exhibit to determine whether it is discoverable. If part of an exhibit is discoverable, the court must redact the undiscoverable portions of the materials. See Kuiper, 632 P.2d at 702.

B.  Did the District Court err in determining that one of Farmers' former defense attorneys waived the protection of the work-product doctrine by making testimonial use of certain work-product materials?

In addition to ordering production of Farmers' claim files, the District Court, during the course of the trial, ordered Farmers' former attorneys from the law firm of Smith, Walsh, Clarke, and Gregoire (the Smith firm) to produce several of the firm's witness files. The court specified certain files on named witnesses and any files that had anything to do with speed.

Palmer argues that attorney Walsh waived the work-product immunity by making testimonial use of the materials at trial. On the other hand, Farmers argues that, except for his testimony

**33**

regarding expert witness Dr. Shapley, Walsh only generally mentioned four other witnesses. Therefore, Farmers argues, Walsh did not waive the protection of the work-product doctrine for anything but the Shapley file.

In the present case, the court ordered production of the Smith firm's work-product files without discriminating as to whether the materials contained therein were ordinary work product or opinion work product. However, the immunity from discovery given to opinion work product cannot be waived as easily as the immunity given to ordinary work product.

The standards for waiver by testimonial use of the work product differ between opinion and ordinary work product. Waiver by testimonial use does not apply to opinion work product unless the witness directly discloses his or her mental impressions. See In re Martin Marietta Corp. (4th Cir. 1988), 856 F.2d 619, 625. With ordinary work product, once a witness makes testimonial use of the files, the witness implicitly waives the protections of the work-product doctrine with respect to factual matters covered in the testimony of the witness. Martin Marietta Corp., 856 F.2d at 625; Nobles, 422 U.S. at 239.

In this case, Palmer's attorney challenged witness Rausch to explain why Farmers hired Dr. Shapley as an accident reconstruction expert but failed to have him testify in the uninsured motorist trial. Rausch was not the one who made the decision and could not address the question, so Farmers called its former attorney James Walsh to explain why Shapley was not called as a witness.

Walsh testified concerning his dealings with Shapley, the general nature and calculations he requested Shapley to make, and Shapley's conclusions. Walsh testified that he decided there was no need to call Shapley because his opinions were consistent with those of Palmer's expert.

Walsh thus directly disclosed his mental impressions concerning his decision not to call Shapley as a witness. By doing so he waived the immunity for his mental impressions contained in the Smith firm's Shapley files.

In addition to discussing Shapley, Walsh referred to the dirt bikers and their observation of the speed of the motorcycle. He stated that, based on Shapley's calculations, Farmers knew early on that speed was not a factor in the accident. Walsh also referred to the credibility of witness Atchison.

Walsh did not, however, testify to the substance of any of the work product in his file, nor did he refer to any of the materials in his firm's work product files. In fact, he stated that he did not rely on any of the firm's files in testifying, rather he remembered what happened at trial. He testified on cross-examination that he was unfamiliar with the content of most of his firm's witness files because, for the most part, they were prepared and used by Gregoire.

Walsh did not disclose his or his partners' mental impressions concerning those witnesses. In addition, Walsh did not make testimonial use of the Smith firm's files regarding those witnesses. Walsh merely referred to facts brought out in the

underlying trial. Therefore, Walsh's testimony did not waive the work-product doctrine's protection of his mental impressions, nor did his testimony implicitly waive the protection of factual matters pertaining to those witnesses.

The Court's order requiring the disclosure of certain work product materials of the Farmers' attorneys and especially of attorney Gregoire and the use of such materials in cross examination of attorney Walsh placed Farmers in the prejudicial position of having to explain such private thoughts, impressions, notes, etc., which were clearly work product.

We conclude that the admission of certain work product into evidence materially affected Farmers' substantive rights and prevented Farmers from having a fair trial. See § 25-11-102(1), MCA. On these grounds, we vacate the District Court's order and judgment and remand for a new trial.

V.

Did the District Court err in admitting evidence of the litigation tactics of Farmers' attorneys and of its decision to appeal?

Prior to trial and again on the first day of trial, Farmers made a motion in limine to exclude evidence of the conduct of Farmers' attorneys in defending the underlying uninsured motorist case and of Farmers' decision to appeal the judgment in that case. The District Court denied the motion and allowed Palmer to introduce evidence of the litigation strategy and tactics Farmers' attorneys used in defending the uninsured motorist case and of Farmers' decision to appeal the judgment in that case.

36

A.   Is evidence of an insurer's post-filing conduct, such as litigation strategy and tactics in defending the underlying suit, admissible in a bad faith action?

Farmers contends that after litigation commenced, the parties assumed adverse positions, and events occurring after that time could not form the basis of either a common law or a statutory bad faith claim.   Farmers further contends that allowing a jury to consider evidence of litigation conduct is extremely prejudicial to an insurer's right to defend against a claim it believes lacks merit.

Palmer, on the other hand, contends that "conduct during the trial was highly relevant to establish that both the initial investigation and denial were incomplete and erroneous and that Farmers' course of conduct continued by attempting to cover up the true facts belatedly discovered."

Courts have held, and we agree, that an insurer's duty to deal fairly and not to withhold payment of valid claims does not end when an insured files a complaint against the insurer.   See, e.g., White v. Western Title Ins. Co. (Cal. 1985), 710 P.2d 309, 317. Several courts have considered whether evidence of an insurer's conduct during litigation of the underlying suit is admissible in a subsequent bad faith action.   After examining the reasoning of courts that have considered the issue, we conclude that the continuing duty of good faith does not necessarily render evidence of an insurer's post-filing conduct admissible.   See Palmer v. Ted Stevens Honda, Inc. (Cal.App. 1987), 238 Cal.Rptr. 363, 366-69; White, 710 P.2d at 317 (as interpreted by both Nies v. National

**37**

Auto. & Casualty Ins. Co. (Cal.App. 1988), 245 Cal.Rptr. 518, 523-25, and California Physicians' v. Superior Ct. (Cal.App. 1992), 12 Cal.Rptr.2d, 95, 99-100). Indeed, courts rarely should allow such evidence and we have adopted a balancing test for those rare circumstances.

Public policy favors the exclusion of evidence of an insurer's post-filing litigation conduct in at least two respects. First, permitting such evidence is unnecessary because during the initial action, trial courts can assure that defendants do not act improperly. Next, and more importantly, the introduction of such evidence hinders the right to defend and impairs access to the courts.

The Rules of Civil Procedure control the litigation process and, in most instances, provide adequate remedies for improper conduct during the litigation process. Once the parties have assumed adversarial roles, it is generally for the judge in the underlying case and not a jury to determine whether a party should be penalized for bad faith tactics. Ted Stevens Honda, 238 Cal.Rptr. 363, 369, (citing White, 710 P.2d at 325 (Lucas, J., concurring and dissenting)).

An attorney in litigation is ethically bound to represent the client zealously within the framework provided by statutes and the Rules of Civil Procedure. These procedural rules define clear boundaries of litigation conduct. If a defense attorney exceeds the boundaries, the judge can strike the answer and enter judgment for the plaintiff, enter summary judgment for the plaintiff, or

**38**

impose sanctions on the attorney. See White, 710 P.2d at 325, (Lucas, J., concurring and dissenting). There is no need to penalize insurers when their attorneys represent them zealously within the bounds of litigation conduct. To allow a jury to find that an insurer acted in bad faith by zealously defending itself is to impose such a penalty.

The most serious policy consideration in allowing evidence of the insurer's post-filing conduct is that it punishes insurers for pursuing legitimate lines of defense and obstructs their right to contest coverage of dubious claims. As discussed below, if defending a questionable claim were actionable as bad faith, it would impair the insurer's right to a zealous defense and even its right of access to the courts.

Allowing evidence of litigation strategies and tactics would expose the insurer's entire defense in a coverage action to scrutiny by the jury, unless the insurer won the underlying suit. The jury then, with the assistance of hindsight, and without the assistance of insight into litigation techniques, could "second guess the defendant's rationales for taking a particular course." White, 710 P.2d at 324 (Lucas, J., concurring and dissenting). In addition, the jury could consider evidence of the defendant's litigation strategy and tactics without any showing that the insurer's conduct was technically improper. Thus, insurers would be reluctant to contest coverage of questionable claims.

The case at hand exemplifies the warning given by Justice Lucas in his dissent to White. Justice Lucas warned that

**39**

permitting evidence of the post-filing conduct of the insurer's attorneys would allow juries to impose liability for litigation tactics which are in and of themselves proper, merely because a jury may conclude that the strategy and tactics in and of themselves amounted to bad faith. See White, 710 P.2d at 323-24 n.4 (Lucas, J., concurring and dissenting).

In this case, as in White, the plaintiff did not contend that insurer's tactics in and of themselves were improper, rather the implicit claim was that the litigation strategy and tactics amounted to bad faith. The jury was allowed to consider Farmers' legitimate defense strategy and proper litigation tactics as evidence of bad faith, when the relevant inquiry should have been whether Farmers' had a reasonable basis for denying the claim.

To permit evidence of insurers' litigation strategies and tactics is to impede insurers' access to the courts and right to defend, because it makes them reluctant to contest coverage of questionable claims. "Free access to the courts is an important and valuable aspect of an effective system of jurisprudence, and a party possessing a colorable claim must be allowed to assert it without fear of suffering a penalty more severe than typically imposed on defeated parties." White, 710 P.2d at 324 (Lucas, J., concurring and dissenting) (quoting Young v. Redman (Cal.App. 1976), 128 Cal.Rptr. 86, 93). Public policy dictates, therefore, that courts must use extreme caution in deciding to admit such evidence even if it is relevant to the insurer's initial decision to deny the underlying claim.

This brings us to another crucial point, the relevance of the insurer's post-filing conduct. In general, an insurer's litigation tactics and strategy in defending a claim are not relevant to the insurer's decision to deny coverage. Indeed, if the insured must rely on evidence of the insurer's post-filing conduct to prove bad faith in denial of coverage, questions arise as to the validity of the insured's initial claim of bad faith. One court has gone so far as to hold that "once litigation has commenced, the actions taken in its defense are not, in our view, probative of whether defendant in bad faith denied the contractual lawsuit." Ted Stevens Honda, 238 Cal.Rptr. at 368.

After the onset of litigation, an insurer begins to concentrate on supporting the decisions that led it to deny the claim. The insurer relies heavily on its attorneys using common litigation strategies and tactics to defend against a debatable claim. Consequently, actions taken after an insured files suit are at best marginally probative of the insurer's decision to deny coverage. See Randy Papetti, Note, Insurer's Duty of Good Faith in the Context of Litigation, 60 Geo. Wash. L.Rev. 1931, 1972 (1992).

In some instances, however, evidence of the insurer's post-filing conduct may bear on the reasonableness of the insurer's decision and its state of mind when it evaluated and denied the underlying claim. Therefore, we do not impose a blanket prohibition on such evidence.

We believe the correct approach is to strike a balance between deterring improper conduct by the insurer and allowing insurers to defend themselves against spurious claims. Rule 403, M.R.Evid., provides for that balance. When the insurer's post-filing conduct has some relevance, the court must weigh its probative value against the inherently high prejudicial effect of such evidence, keeping in mind the insurer's fundamental right to defend itself. See Rule 403, M.R.Evid.; White, 710 P.2d at 324 n.5 (Lucas, J., concurring and dissenting).

The following comment on the relevance of post-filing conduct expresses our position on the issue.

> When evaluated through the prism of the substantive law, an insurance company's postfiling conduct, particularly its litigation conduct, has little relevance to proving that the insurer's prefiling actions resulted in the wrongful denial of policy benefits. Litigation, in almost all cases, does not commence until after the policyholder's claim has been denied or the insurer has failed to respond to a policyholder's claim within a sufficient amount of time. In contrast, the actual tort occurs, or does not occur, contemporaneously with the "wrongful denial of coverage"--an act that occurs well before any improper litigation conduct takes place. Damages likely will be incurred after the wrongful denial of a claim as a result of the continued deprivation of policy benefits, but the tort itself occurs when the contract is breached unreasonably. Thus, courts that merely inquire into the reasonableness of a defendant insurer's postfiling conduct itself fail to recognize that, in most cases, the only possible relevance of such evidence is to reinforce or expose the unreasonableness of the original denial of coverage. Improper postfiling conduct, no matter how unreasonable, is rarely actionable in and of itself under the rubric of bad faith tort action. When analyzing the relevance of an insurer's postfiling conduct, therefore, the proper inquiry should be into the extent to which such conduct casts light on the reasonableness of the original denial of the policyholder's claim.

*Insurer's Duty of Good Faith*, 60 Geo. Wash. L.Rev. at 1969-70. (Emphasis added.)

After analyzing Farmers' post-filing conduct, we find that the prejudicial nature far outweighs any relevance of the conduct. The following examples illustrate how Palmer used evidence with little or no relevance to prejudice the jury against Farmers.

First, Farmers reimbursed key witness Atchison for lost wages and expenses incurred in traveling to the accident scene to help him remember, and Farmers' attorneys better understand, the events on the day of the accident. Palmer's counsel implied to the jury that this conduct constituted a bribe for changing his testimony.

Farmers' attorneys also invited other witnesses to view the scene. Farmers invited the dirt bikers as well as the deputy sheriffs and the highway patrol officer who investigated the accident. The Meagher County Attorney accompanied the officer. Palmer's attorney implied through his questioning that this so-called "firming up" session was somehow unethical or illegal.

The "firming up" session, and questions regarding it, have little or no probative value. Implications of unethical or illegal behavior are inherently prejudicial, especially in a bad faith case. The prejudicial effect of the evidence far outweighs any possible probative value.

Furthermore, Palmer's attorney, over objection, criticized witness Rausch for not alerting the jury that witness Atchison had changed his story about whether the motorcycle had passed behind or in front of the truck. Through his questioning in the bad faith

trial, Palmer's attorney insinuated that Farmers had an obligation to alert the jury in the underlying trial that Atchison had changed parts of his description of the accident.

In addition, Palmer's attorneys continually challenged Rausch to explain and defend the comments and conduct of Farmers' counsel in defending the underlying case. Rausch was unable to explain to the jury all of the intricacies of the defense attorneys' actions and strategies carrying out discovery, obtaining witness statements, taking depositions, preparing for trial, and conducting trial. Nor was Rausch equipped to explain motions to compel, why Farmers was reluctant to produce work product for Palmer, and why Farmers did not call one of its expert witnesses in the underlying trial. Only the attorneys could explain these circumstances.

Last, defense attorney Gregoire was cross-examined extensively on his role in meeting with Atchison and cross-examining other witnesses at trial and in depositions. Palmer's attorney suggested to the jury that Gregoire asked an investigator to "tail" a witness, not to see if she stayed with Palmer's family, but to "get some dirt on her."

All of this evidence was prejudicial because it allowed the jury to second guess Farmers' attorneys and to consider legitimate defense strategy and proper litigation tactics as evidence of bad faith. The evidence does not relate to the reasonableness of the original denial of the policyholder's claim, and therefore, has little or no relevance. Thus, the District Court erred by admitting evidence of Farmers' attorneys' post-filing conduct.

**44**

In the bad faith trial, Palmer introduced other post-filing conduct of Farmers' attorneys. We need not rule on its admissibility because we are remanding for a new trial. The trial judge can inquire into the extent to which the conduct casts light on the reasonableness of Farmers' original denial of Palmer's uninsured motorist claim. If the conduct is sufficiently related to Farmers' denial of the claim, the judge can then determine whether the probative value of the evidence outweighs its prejudicial effect, keeping in mind Farmers' right to defend its denial of a questionable claim.

B.   Is an insurer's decision to appeal the verdict in the underlying case admissible as evidence in a subsequent bad faith action based on the insurer's decision to deny coverage?

Farmers contends that post-judgment conduct is not admissible as evidence of bad faith. Specifically, Farmers argues that "no bad faith occurred by virtue of the fact that Farmers appealed the jury verdict." We agree.

This Court, and not a jury, is in the best position to determine the merits of appeals to this Court. As discussed above, sanctions are available for frivolous litigation tactics, including the filing of a frivolous appeal.

We agree with the following analysis by the California Supreme Court:

> Although there are many contexts in which jury determinations may be superior to those of trial or appellate judges, the determination of the frivolousness of an appeal is not one. And the potential "chilling effect" on appeals . . . would be greatly exacerbated if every appellant faced the prospect that a jury might impose additional damages--compensatory and punitive--in

**45**

a subsequent action based on its assessment of his or her motive in prosecuting the appeal.

Coleman v. Gulf Ins. Group (Cal. 1986), 718 P.2d 77, 81.  We hold that the District Court's decision to admit evidence of Farmers' decision to appeal the jury verdict was erroneous and prejudiced Farmers.

## SUMMARY

The District Court did not err in denying Farmers' motion for a directed verdict.  However, Farmers is entitled to a new trial for two distinct reasons.  First, the court compelled discovery of materials subject to the attorney-client privilege and then admitted the materials into evidence.  Second, the court compelled discovery of work product without an adequate showing by the plaintiff and then admitted the materials into evidence.  The admission of certain undiscoverable work product into evidence prejudiced Farmers and prevented it from having a fair trial, as did the admission of material subject to attorney-client privilege. Farmers is thus entitled to a new trial.

Farmers listed several other issues for our review.  However, we are not considering them because on remand they might arise in a different context, if at all.

_____
Justice

We Concur:

_____
Chief Justice

46

John Conway Harrison

Karla M. Gray

_____
Justices

47

Justice Terry N. Trieweiler dissenting.

I dissent from the opinion of the majority.

Any group of people who, without a qualm, would take $1.5 million from a severely brain damaged man who can no longer care for himself in order to protect the secret maneuverings of a few lawyers, ought to have a better familiarity with the record than is demonstrated by the majority's opinion.

After carefully reviewing the record, I conclude that the majority opinion has distorted the rulings of the District Court; ignored and wasted hours of conscientious service by the jurors who served in this case; and unjustly treated the victim whose efforts to reclaim some modicum of dignity have been dealt a severe set-back by this decision.

I have no quarrel with attorney-client privilege, nor the work product doctrine. Under the appropriate circumstances, those principles provide a necessary shield from exposure of an attorney's candid communications and mental impressions. However, this opinion does not limit these worthwhile privileges to their intended defensive purpose. It allows them to be used as an offensive spear for the selective benefit of the insurer and its attorneys. It allows an insurer to selectively use records from its file which serve its self-interest, while denying its own policy holder an opportunity to search those same files for materials which are inconsistent. It allows the attorneys of an insurer to offer self-serving opinions and mental impressions, but

denies the attorney for a policy holder the opportunity to effectively cross-examine the insurer's attorney by knowing what his or her opinions or impressions were at an earlier time when decisions were made which were adverse to the policy holder's interest and may have been a violation of our laws.

Neither the attorney-client privilege, nor the work product doctrine, were intended for such selective application as is permitted by the majority's opinion.

To fully understand the injustice of this opinion, it is necessary to understand the actual events which led to the District Court's decision compelling production of Farmers' records. However, it is difficult to glean those events from the majority opinion which, to a large extent, simply sets forth as fact those arguments made in Farmers' brief. Therefore, what follows is a more complete statement of the facts relevant to the legal issues raised on this appeal.

In considering these facts, it should be kept in mind that exceptions to attorney-client privilege and the work product doctrine exist where the party invoking the privilege intends to call his attorney as a witness or defend against a claim that he acted unreasonably by asserting that he acted in reliance on advice of counsel. Another exception to the work product doctrine relating to mental impressions and opinions exists in a bad faith case, like this one, where the mental impressions and opinions of the defendant are the primary issue in the case.

49

David Palmer was severely injured on June 10, 1984, when the motorcycle that he was operating was forced off the road by a semi-truck and trailer that have never been identified. He notified Farmers Insurance Exchange, from whom he had purchased uninsured motorist coverage, of the incident within a short time after the accident. However, his policy had an exclusion for accidents caused without contact between the two vehicles. Farmers' investigation consisted of an interview with the passenger on Palmer's motorcycle and a review of the investigating highway patrolman's report. There were no other witnesses to the accident, and because of the exclusion, nothing further was done to investigate the claim until over a year later.

On June 19, 1985, we decided *McGlynn v. Safeco Insurance Company of America* (1985), 216 Mont. 379, 701 P.2d 735. In that case, we held that the exclusion relied on by Farmers was void as a matter of public policy. Following our decision in *McGlynn*, Farmers referred this case to the law firm of Smith, Walsh, Clark and Gregoire for further investigation and advice. From that point on, additional investigation was done by Bruce Vassar, the law firm's investigator, and was reported to Farmers by members of the firm.

It was the law firm's investigation and reports to Farmers which led to Farmers' final rejection of Palmer's claim in February 1986. In fact, that rejection was communicated to Palmer's attorney by Marvin Smith, a member of the law firm. Following the denial of his claim, Palmer filed a complaint in the District Court

on February 26, 1986, alleging that he was entitled to coverage for his injuries and that Farmers had acted unreasonably and was guilty of bad faith when it denied his claim.

In its answer, Farmers denied that it had acted in bad faith or violated any reasonable settlement practices. However, by that time the conduct of Farmers' own employees, and the conduct of its attorneys and their investigator, were so interrelated that they could not, for practical purposes, be separated with regard to the issue of whether or not the claim had been reasonably denied.

On May 8, 1986, the District Court, pursuant to our decision in *Fode v. Farmers Insurance Exchange* (1986), 221 Mont. 282, 719 P.2d 414, bifurcated plaintiff's claims and ordered that the underlying claim for coverage pursuant to the uninsured motorist contract should be tried first, and that any bad faith should be considered after that case was resolved by settlement or judgment.

The contract claim went to trial on March 9, 1987, and a jury rendered its verdict in favor of Palmer on March 13, 1987. Bill Gregoire and Jim Walsh represented Farmers at that trial.

Following trial, Gregoire advised Farmers that he thought there were several technical bases for appeal to the Supreme Court, but also advised the company that even if the case was reversed by the Supreme Court, a second jury would probably return the same verdict in favor of Palmer. Farmers chose to proceed with the appeal anyway, reasoning that if it was successful on appeal, there

would be some benefit to the bad faith claim which was still pending.

On September 13, 1988, this Court rendered its decision affirming the judgment of the District Court.

On October 26, 1988, Palmer's attorney advised Farmers' attorney that he was ready to proceed with the bad faith claim. In response to that notice, Gregoire, who was still acting as Farmers' attorney, and who had complete authority to waive any privilege that his client could claim (*see Drimmer v. Appleton* (S.D.N.Y. 1986), 628 F. Supp. 1249), wrote the following letter to Palmer's attorney:

Dear Dennis:

As we explained over the telephone, we do not believe that we can continue to represent Farmers Insurance Exchange in the action you have filed. There seems to be little question but that Marvin Smith, Jim Walsh, and myself will be witnesses in the action that is presently pending in the District Court. We would assume that you and Mr. Risjord would likewise be witnesses.

At that point in time, the only remaining issue to be decided in the bifurcated claim was whether Farmers had acted reasonably or in bad faith when it denied plaintiff's claim for payment pursuant to his uninsured motorist policy. The information that Farmers relied on, and the impressions and opinions of its employees regarding its obligations to its insured, became the primary issues that remained in the litigation. Farmers' claims adjusters, its attorneys, and their investigator acted in concert. There was no way to separate Farmers' impressions or opinions from its attorneys' impressions. There was no way to critique whether

52

Farmers acted reasonably without considering the advice it relied upon from its attorneys. It is for these reasons that the Ninth Circuit Court of Appeals in a similar case has held that work product may be discovered in insurance bad faith claims. In *Holmgren v. State Farm Mutual Automobile Insurance Company* (9th Cir. 1992), 976 F.2d 573, State Farm was sued pursuant to § 33-18-201(2), (4), (6), and (13), MCA, of Montana's Unfair Trade Practices Act. Judgment was entered for the plaintiff. On appeal, State Farm argued that the district court erred when it ordered the company to produce, and then admitted as evidence, handwritten memoranda drafted during the litigation of the underlying personal injury claim. The memoranda contained notes written by State Farm's adjuster fixing a range of values for plaintiff's claim which were far above any amount offered by State Farm. State Farm argued that the notes constituted opinion work product which was protected under Rule 26(b)(3), Fed.R.Civ.P. Our corresponding rule is identical. The Ninth Circuit disagreed. In affirming the district court, it held that:

> We agree with the several courts and commentators that have concluded that opinion work product may be discovered and admitted when mental impressions are *at issue* in a case and the need for the material is compelling. *See, e.g., Bio-Rad Labs., Inc. v. Pharmacia, Inc.*, 130 F.R.D. 116, 122 (N.D.Cal. 1990); *Reavis [v. Metropolitan Property & Liability Ins. Co.]*, 117 F.R.D. [160,] 164 [S.D.Cal. 1987]; *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 932-33 (N.D.Cal. 1976); *Bird v. Penn Cent. Co.*, 61 F.R.D. 43, 47 (E.D.Pa. 1973); 4 J. Moore, Federal Practice ¶ 26.64 [3.-2], at 26-385 & n.8 (2d ed. 1991); J. Anderson et al., The Work Product Doctrine, 68 Cornell L.Rev. 760,

831-37 (1983). *But see* 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2022, at 188 n.97, 193, § 2026, at 229-32 (1970).

Both elements are met here. In a bad faith insurance claim settlement case, the "strategy, mental impressions and opinion of the [insurer's] agents concerning the handling of the claim are directly at issue." *Reavis*, 117 F.R.D. at 164. Further, Holmgren's need for the exhibits was compelling. Montana permits insureds and third party claimants to proceed under § 33-18-201 against an insurer for bad faith in the settlement process. *See* Mont. Code Ann. § 33-18-242 (1979) (applicable to claims arising after July 1, 1987); *Klaudt v. Flink*, 202 Mont. 247, 658 P.2d 1065, 1067 (1983), *overruled on other grounds*, *Fode v. Farmers Ins. Exch.*, 221 Mont. 282, 719 P.2d 414 (1986). Unless the information is available elsewhere, a plaintiff may be able to establish a compelling need for evidence in the insurer's claim file regarding the insurer's opinion of the viability and value of the claim. We review the question on a case-by-case basis.

. . . .

In *Handgards*, "the lawyers who managed and supervised the former litigation for the defendants [were] being called as witnesses to express their opinions as to the merits of the prior suits." *Handgards*, 413 F.Supp. at 931. This comment, and others like it in "at issue" cases, is a practical acknowledgment of the fact that, in bad faith settlement cases, insurers may call their adjusters to testify to their opinions as to the lack of viability of the underlying claim. When an insurer chooses to remain mute on the subject, the plaintiff is not foreclosed from developing the same evidence.

*Holmgren*, 976 F.2d at 578.

The *Holmgren* decision refers to mental impressions and opinions of the insurer's agents. In that case, the agents were adjusters. In this case, the agents were adjusters and attorneys. Farmers attorneys were involved in the investigation and evaluation of this case long before there was any lawsuit filed by Palmer. Their

54

opinions, advice, and mental impressions cannot be separated from those of Farmers' adjusters in the evaluation of the reasons for denying plaintiff's claim.

The majority adopts Farmers' position that even if work product protection did not apply under these circumstances, the communications from Farmers' attorneys, which were included in Farmers' claims file, were protected by attorney-client privilege. However, Farmers waived any claim to attorney-client privilege when it advised Palmer, through Gregoire, that its attorneys would be called as witnesses in the bad faith case.

In discussing exceptions to the work product doctrine, the Ninth Circuit, in *Holmgren*, relied on *Handgards, Inc. v. Johnson & Johnson* (N.D.Cal. 1976), 413 F. Supp. 926. In addition to discussing the work product doctrine, that decision also dealt with a claim of attorney-client privilege under circumstances similar to those in this case. In *Handgards*, the defendant was accused of filing patent infringement suits against the plaintiff in bad faith as part of a conspiracy to restrain trade and monopolize the disposable plastic glove industry. The plaintiff learned that the defendant intended to call the lawyers who had handled the prior complaints as witnesses on its behalf. The plaintiff, therefore, sought discovery of any documents generated by these attorneys which would indicate their purpose for filing the suits. The defendant objected, based upon a claim of attorney-client privilege. The district court held that by listing the attorneys as witnesses, the

55

defendant had injected the advice of counsel as a defense, and thereby, waived the attorney-client privilege. It reasoned as follows:

> By putting their lawyers on the witness stand in order to demonstrate that the prior lawsuits were pursued on the basis of competent legal advice and were, therefore, brought in good faith, defendants will waive the attorney-client privilege as to communications relating to the issue of the good-faith prosecution of the patent actions. *Garfinkle v. Arcata National Corp.,* [64 F.R.D. 688 (S.D.N.Y. 1974)] . . .; 8 Wigmore, Evidence § 2327 (McNaughton rev. 1961).

*Handgards,* 413 F. Supp. at 929.

That district court also discussed defendant's objection to production of these materials on work product grounds. It held that:

> The principal issue in the case at bar is the good faith of the defendants in instituting and maintaining the prior patent litigation against plaintiff. Plaintiff's success in the instant action depends on a showing that defendants pursued the prior suits knowing they would be unsuccessful on the merits. Since the lawyers who managed and supervised the former litigation for the defendants are being called as witnesses to express their opinions as to the merits of the prior suits and the validity of the underlying patents, plaintiff has a particularized and compelling need for the production of the relevant work product of these attorneys. Without discovery of the work product, plaintiff will be unable to ascertain the basis and facts upon which the opinions of these witnesses are based. This will undoubtedly impair plaintiff's ability for effective cross-examination on a crucial issue.

*Handgards,* 413 F. Supp. at 931.

Similarly, in *Leybold-Heraeus Technologies, Inc. v. Midwest Instrument Company* (E.D.Wis. 1987), 118 F.R.D. 609, the district court held that by calling their attorneys as witnesses the plaintiff waived the

attorney-client privilege. In that case, both attorneys were listed for the purpose of testifying that the actions against the defendant had been commenced in good faith. However, the plaintiff sought to protect certain documents generated by those same attorneys based on the attorney-client privilege. The district court rejected that argument and held that:

> Upon naming two of their attorneys as witnesses, LHT and LHG assumed the risk that their claim of attorney-client communication and/or attorney work product would be abrogated. It is difficult for this Court to anticipate the parameters of the testimony of these two (2) attorneys, but certainly Minco would be disadvantaged in cross-examining them, if it does not have available the basis for their testimony. Accordingly, this Court is of the view that many of the documents which Attorneys Hemmingway and Zapfe participated in, either as a recipient of communication or the communicator as to prior art or as to the good faith belief in the validity of the patents in question and the good faith in maintaining the lawsuits of both the present litigation and the Leco case, should be made available for discovery to Minco.

> . . . .

> This Court agrees with Minco's assertion that LHT-LHG cannot selectively disclose portions of privileged communications or give testimony favorable to themselves, without concomitant disclosure of other unfavorable portions of the privileged communications relating to the same subject. *See Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. at 929; *Teachers Ins., Etc. v. Shamrock Broadcasting Co.*, 521 F.Supp. 638, 641 (S.D.N.Y. 1981); *First Federal Savings & Loan v. Oppenheim, Appel, Dixon & Co.*, 110 F.R.D. 557, 567 (S.D.N.Y. 1986); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. at 1161.

*Leybold-Heraeus Tech.*, 118 F.R.D. at 614.

Therefore, when the only remaining issue was whether or not Farmers had acted reasonably based on the information that was

within its knowledge, and when, furthermore, Farmers notified plaintiff that its attorneys would be called as witnesses to establish that it acted reasonably, attorney-client privilege with regard to those attorneys' communications to Farmers was waived and a specific exception to the work product doctrine was established.

The propriety of the District Court's order compelling disclosure of Farmers' claims file was further established by later developments. On September 13, 1989, plaintiff took the deposition of Bud Rausch, defendant's branch claims supervisor who was in charge of reviewing plaintiff's claim. He was obviously a critical witness with regard to the issue of whether or not defendant had a reasonable basis for denying Palmer's claim. Rausch testified that the selective manner in which Farmers documented statements from witnesses was based on advice of counsel. He stated that their decision to retain a reconstruction expert, but then not call that expert at trial, was based on advice of counsel. He even stated that Farmers' claims office had originally decided to pay plaintiff's claim but then changed its mind, based on a conversation with Marvin Smith who based his recommendation on the investigation being conducted by the law firm's investigator.

Rausch gave the following unequivocal testimony which established that the only way Farmers could defend against plaintiff's claim was based on advice of counsel:

> Q. Okay. And you have already told us, and I will ask you again, in case you want to change your mind about this, in your initial conclusion to decline the case, in February 1986, you relied on not only

58

the investigation, but the opinions and advice of the law firm Smith, Baillie, and Walsh?

A. That is true.

Q. And you continued to rely on their work on the trial and interviewing of the witnesses and their opinions during the trial about trial strategy?

A. They were the only firm they had employed at the time. We almost had to.

Q. Well, you did rely on it, whether you had to or not?

A. That's correct.

The majority opinion attempts to excuse Rausch's testimony based on the contrived argument that since Farmers had not pled "advice of counsel" as an affirmative defense, it was not a basis for waiving the attorney-client privilege. However, the important fact is that the claims person employed by Farmers who was principally responsible for denying plaintiff's claim testified that he did so based on the advice of his attorneys. There was no way for plaintiff to determine whether he did so reasonably without knowing the substance of that advice. The only way to know the substance of that advice was to produce the claims file, including the correspondence which included the advice. The majority's distinction between Rausch's testimony and an affirmative defense is a distinction without a difference.

If there was any question about the purpose for which Farmers' attorneys would be called as witnesses, that question was finally resolved when Farmers was compelled by order of the District Court to answer plaintiff's written interrogatories. The interrogatories

59

had been submitted by plaintiff prior to the underlying contract case, but had never been answered by Farmers. Finally, on July 9, 1990, pursuant to the District Court's order dated June 18, 1990, Farmers provided the following answer to Interrogatory No. 1 of plaintiff's third set of written interrogatories:

> Subject to the foregoing objections and without waiving the same, defendant states that Marvin Smith, James Walsh, and Bill Gregoire do have relevant knowledge concerning their actions in preparing the defense of defendant to plaintiff's underlying lawsuit for uninsured motorist benefits and regarding what happened at the trial of that case. Any of them may be called as witnesses for the defendant as to those essentially factual matters. If called as witnesses, those individuals will not be examined regarding their confidential privileged communications to defendant regarding that underlying suit, or the instant bad faith action.

The defendant also listed Billings attorney Steve Harman as an expert, and in response to plaintiff's Interrogatory No. 6 stated that:

> Steve Harman is also expected to testify concerning the defense efforts by the lawyers for Farmers Insurance Exchange in defending and trying the underlying case and whether those efforts were reasonable under the circumstances of that case.

It is clear from these answers, that defendant intended to call its attorneys as witnesses and that they intended to testify regarding their conduct in handling the case. Their conduct in handling the case is inseparable, as a factual matter, from the conduct which gave rise to defendant's denial of plaintiff's claim. It is equally clear that Farmers intended to call an expert to testify regarding the reasonableness of its attorneys' conduct,

60

while at the same time denying plaintiff any access to the contemporaneous records kept regarding those attorneys' conduct.

The majority opinion dismisses these answers to the interrogatories, without fully quoting from them, by pointing out Farmers' self-serving statement that the witnesses would not be called for the purpose of disclosing confidential privileged information. In essence, the majority has held that Farmers and its attorneys can arbitrarily decide which of their communications are privileged and which are not, and testify to those matters which are favorable to Farmers' defense while precluding plaintiff from discovering any matters which might be unfavorable to Farmers' defense. Such a denial of meaningful cross-examination offends any notion of due process with which I am familiar.

Some mention should also be made of the manner in which Farmers actually defended itself at the time of trial. Plaintiff's case was relatively brief. He called Bud Rausch, his treating physician, his mother, and Lee Wise, an expert regarding the issue of bad faith. Farmers' defense, however, consisted completely of testimony from its former lawyers and their investigator, as well as an expert consultant who based his testimony on a review of Farmers' claims file, including the reports issued to Farmers by its attorneys.

Vassar testified about the investigation he conducted; the witnesses he contacted; the substance of what he was told by those

61

witnesses; and the difficulties he encountered when dealing with the investigating highway patrolman.

Walsh testified that he assisted Gregoire as one of the defense attorneys representing Farmers in the underlying trial. He gave extensive testimony about the expert witness that Farmers had consulted and what that expert's conclusions were, even though the witness had not been called in the underlying trial. He gave his opinion about why they were able to defend during the trial without calling an expert witness, and evaluated the testimony of Farmers' principal factual witness in the underlying trial.

Gregoire, who also represented Farmers in the underlying trial, testified extensively about tactical decisions and his evaluation of witness testimony in the underlying case. He testified about his interviews with witnesses; his investigation; and his personal evaluation of the merits of plaintiff's underlying claim. He explained how his firm arrived at the evaluation which led to the denial of plaintiff's claim. He explained their mental processes as they gathered sometimes contradictory information from various witnesses, and told why some witnesses had greater credibility, in his mind, than others. He was allowed to give his personal evaluation of various experts who testified in the underlying case, and repeatedly read from testimony in that case and then gave his analysis of the testimony. He conceded that Farmers spent $100,000 to defend plaintiff's underlying claim for

62

$50,000, and explained at length why it was reasonable to spend twice as much as plaintiff was claiming in an effort to defeat him.

Frank Weedman was a retired claims representative for State Farm Auto Insurance Company who was called by Farmers as an expert to give his opinion that Farmers had acted reasonably. He testified that he had been retained by George Dalthorp, Farmers' attorney in Billings, to testify on numerous previous occasions. He acknowledged that in forming his opinion it was necessary for him to review Farmers' claims file, including correspondence from Farmers' law firm to the claims department. If it was necessary for Weedman to consult the file, how could it be any less necessary for plaintiff's attorneys to have the same information?

It is clear from the November 15, 1988, correspondence, defendant's answers to interrogatories, Rausch's deposition, and the testimony that was actually given at trial, that defendant's attorneys were always intended to be the principal factor in Farmers' defense. Yet Farmers would have foisted that testimony on the court and jury without any meaningful opportunity for plaintiff to cross-examine these witnesses. The majority, by this opinion, has approved of that trial tactic.

In doing so, the majority opinion also suggests that the District Court turned over the Smith law firm's litigation files on a wholesale basis without any justification for doing so. Nothing could be further from the truth. The District Court's original order compelling production of Farmers' files compelled production

63

of only those files generated prior to the time that plaintiff's bad faith complaint was pursued. It did not include any of the Smith Firm's litigation files. However, after Walsh was called to testify on behalf of defendant, plaintiff's attorney requested the court to order production of those witness files referred to during Walsh's testimony. Plaintiff argued that Walsh waived any privilege pertaining to those files as a result of his testimony. Defense counsel conceded that there was a waiver of any privilege concerning defendant's expert witness file, but disagreed that there was a waiver with regard to any other witness. After listening to arguments, the District Court agreed that the privilege had not been waived with regard to the Smith Firm's entire file. The following conversation took place:

> THE COURT: That's where the difficulty comes in is where do you draw the parameters on what's happened? And I would just suggest that Mr. Walsh collect his files and show it to counsel, and if there has to be an in camera inspection, we'll do that.

> MR. CONKLIN: Collect what files, your honor?

> THE COURT: The files relative to his testimony. It is a rather broad testimony, as Mr. Risjord has pointed out. Speed, the truck being on the right side of the road. I mean, you're getting right into the guts of the case.

> . . . .

> THE COURT: I am going to request that -- and I don't know how your files how, but would you collect those files and show them to Mr. Nybo and Mr. Conklin sometime this afternoon, and then we will have to sort through this.

> . . . .

THE COURT: Produce it to your counsel for Farmers Insurance Exchange, Mr. Nybo and Mr. Conklin. In that way we can sort through it, okay? That's the only way that I -- and then we can go from there. You are going to produce -- you are going to go through the file and produce to counsel for the plaintiff those matters that you have no question about that have been waived. And I take it then the matters that you have a question about -- you are going to reserve that for an in camera inspection.

As the actual transcript shows, the District Court was very circumspect and cautious about ordering the production of attorneys' files, while at the same time recognizing that it would be inherently unfair to allow Farmers' attorney to testify about his mental impressions while protecting the actual record of those impressions from discovery by plaintiff. The District Judge stated that when Walsh took the stand:

That placed the advice of counsel squarely at issue in these proceedings. To rule any other way, it is this Court's opinion, would create a very obvious unfairness in this case. There would be no way for counsel for the plaintiff to adequately cross-examine Mr. Walsh in terms of his testimony that took place yesterday.

Most importantly, the court stated that:

The court's ruling is not to be interpreted as a general broad ruling. The ruling is, of necessity, limited to only the testimony that was transcribed yesterday concerning Mr. Walsh's testimony. In other words, counsel is only allowed to get into those areas that were testified to by Mr. Walsh, and I am limiting this ruling narrowly to that testimony. The entire file is not open. It is only open in regard to the matters that were testified to.

The District Court then ordered that Walsh's testimony be transcribed. The following day the District Judge went through that testimony line-by-line with counsel for both parties so that

65

a determination could be made as to the exact extent of the waiver. As a result of that line-by-line examination, he ordered that all information regarding the expert witnesses that Walsh worked with be produced; he ordered production of information from witnesses that Walsh talked to about plaintiff's speed; he ordered that files which had to do with witnesses Atcheson and Diacon be produced; and he ordered that Vassar's notes be produced since he had testified. Finally, the District Judge made it clear that if there was something the parties could not agree on, they could contact the court for an in camera inspection because the court, at that time, did not know what was in the Smith firm's files. After that hearing, the court recessed for the production of the records indicated. After that recess, defendant's attorneys pointed out that there were 32 subfiles in the Smith Firm's litigation records and that some of them had been produced and others were not produced. However, no further request was made by attorneys for defendant for an in camera review of any disputed files.

The impression created in the majority opinion that wholesale production of the Smith Firm's file was ordered, without any in camera review, is a total distortion of the procedure followed by the District Court.

At every step of the proceedings in this case, the District Court ordered the minimal amount of disclosure that could be permitted without denying plaintiff a meaningful opportunity to develop the issue with which the case was concerned, and

66

cross-examine the witnesses that defendant intended to call. The District Court's orders were a model of restraint and should serve as an example for future bad faith litigation, rather than be the majority's excuse for reversing another major verdict against another insurance company found to have abused its insured.

Neither is it correct to conclude that defendant has satisfied the burden imposed by § 25-11-102, MCA, for reversal of the District Court judgment. Even if the majority concluded that the original communications which were the subject of the District Court's order for production were privileged and should not have been produced, there was nothing contained in those records which were prejudicial to defendant. Almost all of the information in the correspondence from the attorneys to Farmers was a factual explanation or legal analysis of why Farmers was justified in denying plaintiff's claim. If the majority had reviewed these records, it would be clear to them that production of the records was not prejudicial to defendant. In fact, the majority of the information included in those reports was relied upon by Farmers in defense of the bad faith case.

Finally, I dissent from that part of the majority opinion which holds that an insurer's decision to appeal the verdict in an underlying case is not admissible as evidence of bad faith. The insurer has a continuing obligation to pay a claim when liability is reasonably clear, and the fact that it may have a technical basis for retrying a case does not establish as a matter of law

67

that there is a reasonable issue about liability. The more reasonable approach to this issue is that adopted by Montana's Federal District Court in *Kyriss v. Aetna Life and Casualty Company* (D.Mont. 1986), 624 F. Supp. 1130. In that case, Aetna moved the Federal District Court to strike that part of plaintiff's complaint which alleged that Aetna acted in bad faith and solely for the purpose of delay in appealing the underlying personal injury verdict to the Supreme Court of Montana. In denying that motion, the court held that:

> Evidence that an appeal was taken in bad faith is neither inconsistent with the general tort principles expressed by the Montana Supreme Court, nor is it inconsistent with the legislative intent expressed in § 33-18-201(6), MCA. The statute speaks generally in terms of "claims," but does not indicate that "claim" is to be given anything but its ordinary meaning, which includes "cause of action."

> Aetna's jurisdictional argument fails for the same reasons. Section 33-18-201 would be stripped of its effectiveness if it did not allow the court to consider all stages of the negotiation and litigation process. Appeal is but one part of that process. Rule 32, M.R.App.P., does not alter this conclusion; it merely gives the Montana Supreme Court authority to award "proper" damages if it "is satisfied from the record and the presentation of the appeal" that the appeal was taken for purposes of delay only. This rule does not deprive a trial court, state or federal, of jurisdiction to consider the motive behind a decision to appeal as one factor in a claim for bad faith against an insurance company. At the appellate level, the decision that an appeal is frivolous is based purely on the trial record and on the appellate briefs and arguments. In a bad faith action, it becomes a question for the jury, to be considered in view of all the plaintiff's evidence of the insurer's conduct in negotiations from start to finish. Of course, if there is sufficient evidence to show a good-faith basis for the appeal as a matter of law, an appropriate motion for directed verdict may be

68

entertained. *See, St. Paul Fire & Marine Ins. Co. v. Cumiskey*, [204] Mont. [350], 665 P.2d 223 (1983).

> Similarly, Aetna's position that plaintiff's claims constitute a "chilling effect" on Aetna's right of access to the courts is without merit. Parties to a state suit in Montana are free to appeal an adverse decision to the state supreme court; review is not discretionary. In this case, the subject matter of Aetna's appeal was the underlying malpractice action, and the issue concerned the proper standard of causation. The subject matter of the instant action is the conduct of Aetna throughout the pendency of plaintiff's malpractice claim--prior to, during, and after trial. The issue of Aetna's bad faith in claims settlement practices is a jury question, and the jury should consider all the facts of the case in reaching its verdict. Montana has enacted a broad legislative scheme for the regulation of insurance companies in accordance with federal law and with the Montana Constitution.

*Kyriss*, 624 F. Supp. at 1133.

Likewise, in this case, Farmers has a duty pursuant to § 33-18-201, MCA, to effect prompt settlement of claims where liability is reasonably clear. That obligation did not end when plaintiff's complaint was filed. It continued through the pendency of that claim and following judgment by the District Court.

Insurance companies have tremendous resources with which to use litigation and appeals to drain their insureds financially and leverage settlements which are otherwise unreasonable based upon the facts of the claim. Whether or not Farmers did that in this case was a factual issue for the jury to decide. Furthermore, that issue was resolved by the jury in this case based on facts which were not evident to the Supreme Court from the record on appeal from the underlying trial. Therefore, any sanction that this Court could have imposed based on the record in that appeal was not

69

adequate to deter an appeal taken solely for the purpose of unreasonably delaying payment of plaintiff's claim.

This decision is a serious blow to those who believe in the statutory obligation that insurance companies have to treat their insureds in a reasonable manner. It is an even more serious blow to those who believe that when one party calls a witness, our rules of discovery were intended to provide the other party with a reasonable opportunity to cross-examine that witness by discovering the factual bases for that witness's opinions and conclusions.

The practical effect of this decision is that insurers can delegate their statutory obligation to investigate claims to a law firm, they can deny those claims based on the advice of that law firm, and then, when the company is accused of violating Montana law by denying the claim unreasonably, the insurer can defend on the basis that it relied on the firm's investigation and advice, while the plaintiff is denied an opportunity to discover the substance of that advice or what the investigation disclosed.

As sure as night follows day, this opinon will spawn a series of "Palmer" seminars around the State where claims adjusters for insurance companies are taught how to mistreat their insureds with impunity by running the records of their mistreatment through law firms which will be glad to assist with their investigation for a fee.

The majority opinion represents a classic example of the legal profession taking care of its own at the expense of everyone else.

70

Hopefully, with the passage of time, this decision will become a relic of an unenlightened period in this Court's history when the rights of individuals were less important than the rights of insurance companies and those law firms that represented them.

However, that will not be much consolation to the District Court or jurors who gave so generously of their time to do the right thing in this case. And, it will not do much good for David Palmer who, at least briefly, thought the law was bigger than his insurance company.

For these reasons, I dissent from the majority opinion.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissent.

_____
Justice